# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 1310 | **DATE** | 9/25/2001 |
| **CASE TITLE** | | Abdishi vs. Philip Morris | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion for summary judgment [56-1] is granted, and judgment is entered in favor of defendant Philip Morris, Inc. and against the plaintiff Kelson Abdishi on Counts I and IV, thereby terminating the last two remaining claims of Plaintiff's complaint. Enter Memorandum Opinion and Order. _Geraldine Soat Brown_

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | | | Document Number |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | SEP 2 6 2001 | | | W6 |
| | Notified counsel by telephone. | | date docketed | | | |
| | Docketing to mail notices. | | | CM | | |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | | |
| kf | courtroom deputy's initials | 01 SEP 25 PM 4: 20 | date mailed notice | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

SEP 2 6 2001

| | |
|---|---|
| KELSON ABDISHI, **Plaintiff,** | ) ) ) |
| v. | ) Cause No. 98 C 1310 ) **Magistrate Judge Geraldine Soat Brown** |
| PHILIP MORRIS, **Defendant.** | ) ) ) |

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on the motion of defendant Philip Morris, Inc. ("Philip Morris" or "Defendant") for summary judgment [Dkt # 56] as to Counts I and IV of the complaint [Dkt # 1] brought by plaintiff Kelson Abdishi ("Abdishi" or "Plaintiff") against Philip Morris. Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the Magistrate Judge. [Dkt ## 27, 28.] Having reviewed the memoranda of law and materials submitted by the parties, and having heard the arguments of counsel, for the following reasons, the Court GRANTS Defendant's motion.[1]

---

[1] Plaintiff filed a six-count complaint. Counts I and IV, the subject of this motion, are directed solely against defendant Philip Morris. Counts II, III, V, and VI were directed solely against, respectively, defendant Hoechst-Celanese Corp. ("Hoechst-Celanese") (Counts II and V) and defendant Westvaco Corp. ("Westvaco") (Counts III and VI). Hoechst-Celanese was dismissed from the case by order dated April 14, 1998, thus terminating Counts II and V. [Dkt # 4.] Subsequently, pursuant to Plaintiff's stipulation [Dkt # 49], Westvaco was dismissed from the case by order dated June 26, 2000, thus terminating Counts III and VI. [Dkt # 50.] Accordingly, this Court's entry of summary judgment in favor of Philip Morris resolves all remaining counts of the complaint.

# NATURE OF THE CASE

Plaintiff's complaint alleges strict product liability and negligence in the manufacture and distribution of cigarettes under the "Marlboro" brand owned by Philip Morris. Plaintiff alleges that Philip Morris manufactured and distributed unreasonably dangerous cigarettes that were tainted by the toxic chemical methyl isothiocyanate ("MITC"). (Compl. Count I ¶ 5b, Count IV ¶ 6b, c.) Plaintiff claims he suffered a severe throat injury when he purchased and smoked some of the tainted cigarettes, which Philip Morris allegedly distributed without any warning notice about the presence of the MITC contaminant in the product. (Compl. Count I ¶¶ 5e, 6, Count IV ¶¶ 6d, 7.) Plaintiff alleges the contaminant was present in the cigarettes generally, and also was present specifically in the cigarette filters manufactured for Philip Morris by defendant Hoechst-Celanese (Compl. Count II ¶¶ 2, 3, 5b, Count V ¶ 6b, c), as well as in the paperboard used in the packaging of both the boxes and cartons used by Philip Morris, which was manufactured by defendant Westvaco (Compl. Count III ¶¶ 2, 3, 5b, Count VI ¶ 6b, c). Plaintiff alleges that as a result of the throat injuries he received by smoking the contaminated cigarettes he had to undergo a direct laryngoscopy and biopsy, esophagoscopy, and tracheostomy, resulting in damages in excess of $50,000. (Compl. Counts I - III ¶ 6, Counts IV - VI ¶ 7.)

# JURISDICTION

Plaintiff filed this lawsuit on May 30, 1997 in the Circuit Court of Cook County, Illinois. Philip Morris filed notice of removal to the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. §§ 1332 and 1441, based on diversity jurisdiction. [Dkt # 1.] Plaintiff sought remand to the Illinois state court, which was denied on June 3, 1998. [Dkt ## 3, 9.]

# BACKGROUND

The deposition transcripts and related exhibits submitted by the parties, and the parties' statements under Local Rule 56.1(a)(3) and (b)(3) as to undisputed facts evidence the following.

### 1. Events Leading to Philip Morris Product Recall

On May 26, 1995, Philip Morris issued a press release announcing a recall of cigarettes manufactured by Philip Morris under 36 brand names, including "Marlboro Lights 100's Gold Soft Pack," and "Marlboro Lights 100's Gold Box." (Def.'s Mot. S. J. ("Def.'s Mot."), Ex. D.) Philip Morris stated that it was undertaking the recall voluntarily, as a precautionary measure, after discovering that a material called "plasticizer," supplied to Philip Morris by an outside vendor and used to make cigarette filters, had been contaminated at the vendor's facility. According to Philip Morris's press release, the contaminant caused formation of MITC in the cigarette filters, which might cause the defective filters to "give off a noticeable odor or have a metallic or other off-taste." Philip Morris warned:

> Continued use of the affected product could result in temporary discomfort, including eye, nose and throat irritation, dizziness, coughing and wheezing. Pregnant women and persons suffering from respiratory conditions should avoid exposure to MITC.

(Def.'s Mot., Ex. D.)

Workers at a Philip Morris manufacturing facility in Charlotte, North Carolina (the "Cabarrus facility") reported on May 18, 1995 that they were noticing a peculiar odor in their facility. (Deposition of Michael Zimmerman at 16-19, Def.'s Mot., Ex. C.) The odor seemed to be coming from the plasticizer being used to make cigarette filters, and was described as the smell of "baby puke" or "sour, dirty feet." (Zimmerman Dep. at 17-19.) A chemical analyst working for Philip Morris, Michael Zimmerman, tested samples of the plasticizer from the Cabarrus facility and

determined the odor resulted from butyric acid, a chemical that ordinarily should not be present in the make-up of the plasticizer. (Zimmerman Dep. at 31-32.) Production was halted at the Cabarrus facility on May 18, 1995, while the tainted plasticizer was removed from the plant and replaced with that of another supplier. (Zimmerman Dep. at 20, 37.)[2]

Philip Morris claims that butyric acid in the amounts Zimmerman detected in the plasticizer is not considered harmful to humans. (Press Release of June 20, 1995, Def.'s Mot., Ex. I.) Plaintiff does not dispute that fact. (Def.'s Mem. at 5, n.3; Pl.'s Resp. at 4.) The Philip Morris decision to recall cigarettes was not prompted by Zimmerman's discovery of butyric acid in the plasticizer, however, but by a discovery Zimmerman made while performing follow-up tests on cigarette filters believed to have been manufactured with the tainted plasticizer. (Zimmerman Dep. at 34-36.) Zimmerman tested the cigarette filters between May 21 and 23 or 24, 1995 and found evidence of MITC in the filters.[3] (Zimmerman Dep. at 34-36.) Zimmerman reported his preliminary findings to Philip Morris officials, who ordered the recall of product on May 26, 1995. (Zimmerman Dep. at 14-15.) As noted previously, in its press release announcing the recall Philip Morris identified

---

[2] Philip Morris concluded that Hoechst-Celanese had supplied a total of eight or nine tanker trucks of tainted plasticizer to the Cabarrus facility and two other Philip Morris plants in Richmond, Virginia and Louisville, Kentucky. (Deposition of Donald Knudson at 13, 16, 24-25, Def.'s Mot., Ex. H.) Philip Morris inspected the shipments from Hoechst-Celanese at the time of delivery, but did not detect any contamination in the plasticizer until it began using the tainted product. The odor was detected when the plasticizer was heated in the cigarette filter manufacturing process. (Knudson Dep. at 27-28.)

[3] MITC is a by-product of the breakdown of chemical compounds used in the manufacture of paperboard such as that used for cigarette cartons and hard-pack boxes. (Zimmerman Dep. at 65-66, 78.) The same compounds–and hence their by-product, MITC–are part of the chemical make-up of two types of pesticides used, among other things, in growing tobacco. (*Recall of Philip Morris Cigarettes, May 1995 - March 1996,* Morbidity and Mortality Weekly Rept. Vol. 45, No. 12 (the "CDC Report") at 2, Def.'s Mot., Ex. J.)

MITC as the cause of the peculiar odor and taste that prompted the recall. (Def.'s Mot., Ex. D.)[4]

## 2. The Product Recall Procedure

To carry out the recall Philip Morris referred to date codes on shipping cases of the affected brands that identified where and when the product was manufactured. (Knudson Dep. at 80.) Philip Morris concluded that the critical dates for manufacture of the tainted cigarettes extended from May 12 to May 23, 1995. (Knudson Dep. at 87-88.) For product Philip Morris still held in its own warehouses or public warehouses, Philip Morris put a shipment hold on all inventory of the 36 brands that was manufactured beginning the day prior to the delivery of tainted plasticizer from Hoechst-Celanese to the day after the tainted plasticizer was removed from Philip Morris's manufacturing facilities. (Knudson Dep. at 77, 80.)

Philip Morris believed that it was likely none of the tainted cigarettes had been shipped from the public warehouses to wholesalers or retailers. Nevertheless, since it could not be certain of that fact, Philip Morris expanded the recall to include all wholesalers and retailers. (Knudson Dep. at 76-77.) For product already shipped to wholesalers, Philip Morris retrieved all inventory produced in the month of May, 1995. (Knudson Dep. at 81.) For product already delivered by wholesalers to retailers, Philip Morris retrieved all inventory of the affected brands held by the retailer, regardless of the date of manufacture. (Id.)

Philip Morris claims it completed the entire recall process by June 6, 1995, including the

---

[4] Philip Morris issued a second press release on June 20, 1995, saying that further research indicated that MITC was not the cause of the peculiar odor that prompted the recall, that the material that caused the odor "presented no safety problem" and was eliminated by switching to a different supplier of plasticizer, and that investigations by Philip Morris and independent toxicologists confirmed the "trace amounts" of MITC in the cigarette filters "do not present any safety concerns for our consumers." (Def.'s Mot., Ex. I at 1, 2.)

clearing of retailers' shelves. (Knudson Dep. at 82-83.) Approximately eight billion cigarettes were said to have been recalled. (Def.'s Mot., Ex. J. at 1, Def.'s Mot., Ex. J.)

### 3. Post-Recall Product Testing by Philip Morris

While the recall process was under way, Zimmerman and other scientists at Philip Morris continued testing to determine the amount of MITC contamination and its cause. (Deposition of Robert Ferguson at 11-12, Def.'s Mot., Ex. E.) Noel Einolf, one of Philip Morris's analytical chemists working in a different department from Zimmerman, heard of the product recall and MITC contamination. (Deposition of W. Noel Einolf at 6, 9, 14, Def.'s Mot., Ex. F.) Einolf advised Zimmerman that in 1992 Einolf had tested the paperboard used by Philip Morris for cigarette boxes and cartons and found MITC in the paperboard. (Einolf Dep. at 50-51.) Einolf made this 1992 discovery in a routine test of materials used by Philip Morris. (Einolf Dep. at 10.) He reported his findings in an inter-office memo. (Einolf Dep. at 14-16.) Einolf was not a toxicologist, however, and had no expertise in the effect of toxins such as MITC on the human body. (Einolf Dep. at 10-11.) His memo reported the amount of MITC found in the paperboard, but did not analyze whether the levels of MITC he discovered were potentially harmful to human beings. (Einolf Dep. at 14-15, 19.)

Zimmerman testified that he first learned of Einolf's 1992 analysis when Einolf contacted Zimmerman shortly after the May, 1995 recall. (Zimmerman Dep. at 66-67.) Zimmerman then reviewed his previous test results and noted that MITC was detected only in the filters of cigarettes that already had been packaged in box packs or cartons. The level of MITC increased depending on the length of time the cigarette filters were in contact with the paperboard packaging. (Zimmerman Dep. at 81-83.) Zimmerman concluded the MITC migrated from the paperboard to the filters.

(Zimmerman Dep. at 84-85.) Philip Morris scientists conducted further tests over the next six months, including tests of Philip Morris's own packaging and cigarette filters, as well as paperboard packaging used for various types of food products. (Einolf Dep. at 54-55, 58; Zimmerman Dep. at 109-112; Ferguson Dep. at 46-47.) The level of MITC in cigarette filters was found to reach a plateau, after which it would dissipate from the filter, disappearing within 24 hours in a cigarette taken out of its package, but more slowly in an unopened pack. (Ferguson Dep. at 54.) The tests by Philip Morris showed that hard-pack cigarette filters absorbed a peak level of approximately 100 nanograms[5] of MITC and soft-pack filters approximately 20 nanograms. Based on "dry-puff" tests (analysis of air drawn through an unlighted cigarette), Philip Morris scientists estimated a person would inhale approximately one per cent of the MITC in the filter while smoking the cigarette (*i.e.,* one nanogram from a hard-pack cigarette, and two-tenths of one nanogram from a soft-pack cigarette). (Ferguson Dep. at 47-48.)

### 4. Centers for Disease Control Investigation of Injury Reports

At the same time Philip Morris was conducting its post-recall studies, an investigation also was carried out by the United States Department of Health and Human Services' Centers for Disease Control ("CDC") on Philip Morris brands covered by the recall. The CDC investigation was prompted by reports from 72 individuals in 27 states who contacted the CDC in June and July 1995 (after Philip Morris announced its recall), complaining of various medical problems they experienced shortly after smoking Philip Morris brands. The reported incidents were claimed to have occurred on or after May 13, 1995. (CDC Report at 1, Def.'s Mot., Ex. J.) The CDC's investigation included interviews of the individuals, review of medical records of those who sought treatment, and, when

---

[5] A nanogram is one-billionth of a gram.

of cigarette samples obtained from the individuals. (*Id.*)

The CDC also analyzed samples of cigarettes manufactured by Philip Morris. Similar to Philip Morris's tests, the CDC analysis found 102 nanograms of MITC in hard-pack cigarette filters and 15 nanograms in soft-pack filters of Philip Morris products. (CDC Report at 2.) The CDC tested cigarettes manufactured as much as one year prior to the recall, as well as cigarettes manufactured during and after the recall. It noted no difference in the chemical make-up of cigarettes recalled by Philip Morris compared with pre-recall or post-recall Philip Morris products, concluding that MITC was present in all the samples it tested. (*Id.*) The CDC noted its laboratory analysis found MITC present both in Philip Morris cigarettes and in cigarettes from other manufacturers. (*Id.*)

The CDC reported its conclusion was that "prolonged cigarette smoking–rather than smoking contaminated cigarettes–caused most of the health complaints" of the 72 individuals. (*Id.* at 2.) The report noted there have been no studies made of the health effects of smoking cigarettes containing the levels of MITC found in the CDC's analysis. (*Id.* at 3.) However, though acknowledging certain limitations in its study, the CDC determined, "Other than the well-established health risks associated with smoking, this investigation did not detect additional health problems related to smoking cigarettes recalled by Philip Morris." (*Id.*)

### 5. *Kelson Abdishi's Claim*

Kelson Abdishi was 57 years old at the time of the Philip Morris recall. (Deposition of Kelson Abdishi at 8, Def.'s Mot., Ex. K.) He was a former Illinois resident who moved to Florida in 1994 after his retirement. (*Id.* at 11-12.) Abdishi smoked cigarettes beginning at age 16, and in 1995 was smoking about a pack a day. (*Id.* at 15, 18-19.) He switched from other brands to smoking

Marlboro Lights 100's in 1991 or 1992, and continued with this brand until after the events complained of in this lawsuit. (*Id.* at 24.) He always purchased the Marlboro Lights 100's soft pack, usually buying two or three packs at a time rather than buying them by the carton. (*Id.* at 29-30, 32.)

Sometime between June 7 and June 9, 1995, Abdishi purchased one or more packs of Marlboro Lights 100's at a Mobil gas station in Palm Harbor, Florida. (*Id.* at 32, 38-40.) He felt a burning sensation in his throat when he smoked these cigarettes (*Id.* at 43), though he did not know what was causing the burning sensation and so continued smoking the cigarettes. (*Id.* at 47-48.) He either smoked the remaining cigarettes he had purchased from the Mobil station, or he discarded them. (*Id.* at 42-43, 48.) He had not heard about the Philip Morris recall at the time. (*Id.* at 63-64.)

On June 9, 1995, Abdishi went to the emergency room of Mease Hospital in Safety Harbor, Florida, complaining of pain and swelling in his neck, a sensation of a foreign body at the back of his throat, and difficulty swallowing. (Mease Hospital Records at M8, M107, Def.'s Mot., Ex. L.) A CAT scan showed "vague soft tissue density" that was characterized by Abdishi's treating physician, James S. Barna, M.D., in his medical records as "a vague neck mass that probably is infective in origin." (*Id.* at M8-M9.)[6] Abdishi was given pain medication and released. (*Id.* at M8, M107.) He returned to the hospital on June 11, 1995, with complaints of increased throat pain and breathing difficulty. He showed a low-grade fever, which he reported having had intermittently for the past week or so. He was treated with intravenous antibiotics and again released. (*Id.* at M8, M10, M104.)

---

[6] Abdishi told the hospital staff taking his history that he had smoked one pack of cigarettes a day for many years (Mease Hospital Records at M8), but apparently he did not report that the "burning sensation" began as he was smoking a cigarette, as he testified in his deposition. (Abdishi Dep. at 43.) See also, Tr. of Feb. 7, 2001 at 33.

Six hours after his release on June 11, 1995, Abdishi returned to the hospital with complaints of increased difficulty breathing. This time he was hospitalized and underwent surgery (laryngoscopy and tracheostomy) to relieve blockage of his airway caused by swelling in his throat. He showed symptoms of infection, diagnosed as most likely being of bacterial origin, and was treated with antibiotics and steroids. He was discharged from the hospital after five days, on June 16, 1995, with no further signs of infection or swelling. (*Id.* at M6-7, M12.)

Sometime after his release from the hospital Abdishi learned of the Philip Morris recall. (Abdishi Dep. at 62-64.) Abdishi testified that when he learned of the recall, he called a friend who worked at the Mobil gas station where Abdishi purchased the Marlboro Lights 100's cigarettes, and asked whether anyone had collected cigarettes from this gas station after the Philip Morris recall. The friend told Abdishi that nobody had collected cigarettes from this location. (*Id.* at 69.)[7]

In August 1995, Abdishi's treating physician, Dr. Barna, wrote to Abdishi's present counsel, apparently in response to a request for information. (Pl.'s Resp., Ex. A.) Dr. Barna reported that sometime after the surgery, Abdishi advised Dr. Barna that at the time of his hospitalization he had been smoking a brand of cigarettes that he subsequently learned was the subject of a recall due to a possible contaminant. Dr. Barna diagnosed Abdishi's condition as angioedema-supraglottitis. (*Id.* at 2.) Dr. Barna advised Plaintiff's counsel that he could not determine whether smoking contaminated cigarettes was the cause of Plaintiff's throat symptoms without knowing additional information about the contaminant involved. (*Id.*)

At his subsequent deposition, Dr. Barna testified in response to questioning by counsel for

---

[7] Other than Abdishi's testimony, there is no evidence in the record to confirm this conversation.

Philip Morris that he had treated Abdishi's condition as a bacterial infection, and could not rule out bacterial infection as the cause. (Deposition of James S. Barna, M.D. at 72, Def.'s Mot., Ex. M.) Counsel for Plaintiff also questioned Dr. Barna at this deposition. Over the objection of defense counsel for failure to disclose Dr. Barna as an expert under Fed. R. Civ. P. 26, Plaintiff's counsel asked whether in Dr. Barna's opinion MITC was a substance that could cause angioedema such as Abdishi experienced. Dr. Barna responded that he was not a toxicologist, but in his opinion MITC could cause such a reaction. (*Id.* at 67-68.)

## LIMITATION ON TESTIMONY FROM PLAINTIFF'S EXPERT

Prior to pursuing the present motion for summary judgment, defendants Philip Morris and Westvaco brought a joint motion to bar the testimony of Plaintiff's only designated expert, Gilbert Elenbogen,[8] and to dismiss the case with prejudice. [Dkt # 38.] On September 7, 1999, Magistrate Judge Ronald A. Guzman granted the motion in part, limiting the scope of Elenbogen's testimony but denying Defendants' motion to dismiss. *Abdishi v. Philip Morris,* No. 98 C 1310, 1999 WL 756054 (N.D. Ill. Sep. 7, 1999) (Guzman, J.). [Dkt # 43.]

Plaintiff proferred Elenbogen as an expert in toxicology who would testify, among other things: 1) that angioedema-supraglottitis can be caused by chemical reaction as well as by infection; 2) that Abdishi's angioedema-supraglottitis was caused by a chemical reaction; 3) that Abdishi smoked a brand of cigarettes found to be contaminated with MITC; 4) that MITC is very toxic and

---

[8] Judge Guzman originally ordered Plaintiff to disclose experts pursuant to Fed. R. Civ. P. 26(a)(2) by March 5, 1999. [Dkt # 30.] On March 8, 1999 Plaintiff sought leave to file the Rule 26(a)(2) disclosure. Judge Guzman orally advised Plaintiff the report was insufficient, and ordered Abdishi to file a report in full compliance with Rule 26(a)(2). Plaintiff supplemented the proposed report, disclosing Gilbert Elenbogen as Plaintiff's only opinion witness, and the Court granted Plaintiff leave to file this supplemented Rule 26(a)(2) disclosure statement. [Dkt ## 32, 33, 34.]

can cause irritation to skin and mucous membranes, and that there have been complaints of nose, eye, and skin irritation and sore throats from people living near fields treated with an agricultural chemical, metam sodium, that rapidly degrades into MITC after application; and 5) that MITC can cause the symptoms Dr. Barna reported for Abdishi, and that if Abdishi smoked cigarettes contaminated with MITC it could have caused the condition Dr. Barna reported. *Id*. at *1-*2.

After reviewing defendants' deposition of Elenbogen and considering Elenbogen's training and experience, Judge Guzman ruled that Elenbogen qualified generally as a toxicologist, but was not qualified to testify to any of these proferred opinions except that MITC was toxic and can cause irritation to skin and mucous membranes, and that metam rapidly degrades into MITC. *Id*. at *4, *10.

Elenbogen has bachelor's and master's degrees in chemistry and a master's degree in environmental engineering. He is certified by the American Board of Toxicology. He worked for a pharmaceutical firm where he conducted toxicity studies, and spent a great portion of his career monitoring and controlling toxic substances in water treatment for the Chicago Metropolitan Water Reclamation District. However, Elenbogen has no prior training or experience with MITC. *Id*. at *3.

Judge Guzman noted that Elenbogen could point to no scientific studies that confirmed his opinions about what level of MITC is toxic in humans (*id*. at *5, *7); he conducted no studies of his own that would establish such toxicity levels (*id*. at *6); he did not test any sample cigarettes and hence could not know to what level of MITC Abdishi might have been exposed (*id*. at *7); he was not a medical doctor and hence was not qualified to make clinical diagnoses as to whether Abdishi's condition was caused by chemical exposure to contaminated cigarettes rather than bacterial infection

(*id.* at \*8-9). Accordingly, Judge Guzman ruled:

> [T]he witness is not competent to testify from personal knowledge that the cigarettes smoked by the plaintiff were contaminated with MITC. Nor is Mr. Elenbogen qualified to opine on the possible causes of specific medical conditions such as angioedema-supraglottitis. *We also find Mr. Elenbogen not qualified to render an opinion as to whether or not the plaintiff's condition was caused by a chemical reaction as opposed to a bacterial infection.* What specifically the plaintiff smoked and his smoking habits in general are also factual questions as to which the expert witness has no personal knowledge. *Finally, the expert's research experience and knowledge are insufficient to allow him to testify that the plaintiff's condition was caused by cigarettes contaminated with MITC.*

*Id.* at \*9 (emphasis added).

Plaintiff has not disclosed any additional expert testimony under Rule 26(a)(2), although Plaintiff's expert discovery was extended to June 20, 2000, by Judge Bobrick. (Schedule set 5/8/00.)


## CHOICE OF LAW

The Court first must determine what substantive law applies in the case. Philip Morris contends that Florida law must apply, based on Illinois' choice of laws rule that applies the "most significant relationship test." (Def.'s Mem. at 15-16.) Plaintiff has not addressed the issue in its brief. The Court finds that Florida substantive law must be applied.

A federal court exercising diversity jurisdiction must consult the choice of laws rules of the state in which the court sits to determine which state's substantive law should apply. *GATX Leasing Corp. v. National Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir. 1995). In dealing with choice of law issues in the area of tort, Illinois courts apply the law of the state in which the tort occurred unless another state has a more significant relationship to the occurrence or the parties. *Ingersoll v. Klein*, 262 N.E.2d 593, 595 (Ill. 1970). The factors to be considered in determining which state has the most significant contacts include:

(a) The place where the injury occurred.  (b) The place where the conduct occurred.
(c) The domicile, nationality, place of incorporation and place of business of the
parties.  (d) The place where the relationship of the parties is centered.

*Id.* at 596.  The principles in *Ingersoll* also apply in product liability claims under Illinois law.

*Forty-eight Insulations, Inc. v. Johns-Manville Corp.*, 472 F. Supp. 385, 392 (N.D. Ill. 1979).

In the present case, Abdishi's alleged injury occurred in Florida, where he is a resident and

received all his treatment relating to the alleged injury.  It is not established where Philip Morris

manufactured the cigarettes Abdishi purchased, but potentially they may have been manufactured

in any one of three plants located in North Carolina, Virginia, or Kentucky.  Regardless of where the

cigarettes were manufactured, however, the relationship between Abdishi and Philip Morris logically

is centered where Abdishi purchased and consumed the product.

These circumstances require under *Ingersoll* that this Court apply Florida law.  It is to be

anticipated in a product liability claim that a defective product may be manufactured in one state and

purchased and used in one or more other states.  Under these circumstances, courts dealing with

product liability cases and Illinois choice of laws rules, after considering the relevant factors, have

applied the substantive law of the state where the injury occurred.  *Ruiz v. Weiler & Co., Inc.*, 860

F. Supp 602 (N.D. Ill. 1994)(machine manufactured in California; injury in Illinois: applied Illinois

law); *Johnson v. Ranch Steamboat Condo. Assn.*, No. 95 C 7562, 1999 WL 184068 (N.D. Ill. Feb.

2, 1999) (Manning, J.) (garage door manufactured in Illinois; injury in Colorado to Kansas resident:

applied Colorado law).  Accordingly, the Court will apply Florida substantive law.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the court "is not required to draw unreasonable inferences from the evidence." *St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir. 1997). The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the opposing party must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Id.* at 324. The non-moving party must designate specific facts showing that there is a genuine issue for trial. *Id.* It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the non-moving party bears the responsibility of identifying the evidence upon which it relies. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). "[N]either 'the mere existence of some alleged factual dispute between the parties'. . . nor the existence of 'some metaphysical doubt as to the material facts,' is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997)(quoting *Anderson*, 477 U.S. at 247 and *Matushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## DISCUSSION

Abdishi asserts a products liability claim against Philip Morris under both negligence and

strict liability theories. Under Florida products liability law, "[i]n order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish the manufacturer's relationship to the product in question, the defect and unreasonably dangerous condition of the product, and the existence of the proximate causal connection between such condition and the user's injuries or damages." *West v. Caterpillar Tractor Co., Inc.*, 336 So.2d 80, 87 (Fla. 1976). Whether case is founded in negligence, breach of implied warranty, or strict liability, plaintiff has burden of establishing: (1) that a defect was present in the product; (2) that it caused the injuries complained of; and (3) that it [the defect] existed at the time the retailer or supplier parted possession with the product. *Cassisi v. Maytag Co.,* 396 So.2d 1140, 1143 (Fla. App. 1st Dist.1981).

Philip Morris contends that summary judgment is proper because Abdishi has failed to establish that his injury was proximately caused by smoking Philip Morris cigarettes containing trace amounts of MITC. (Def.'s Mem. at 17.) Where medical causation is at issue in a product liability claim, Florida law requires the plaintiff to prove causation by a preponderance of evidence to a degree of reasonable medical probability. *Christopher v. Cutter Laboratories,* 53 F.3d 1184, 1190 (11th Cir. 1995); *Reaves v. Armstrong World Indus., Inc.*, 569 So.2d 1307, 1309 (Fla. App. 4th Dist. 1990). Mere possibility of such causation is insufficient. The plaintiff must show that the product manufacturer's actions "more likely than not" were a "substantial factor" in causing plaintiff's injury. *Christopher,* 53 F.3d at 1184; *Reaves,* 569 So.2d at 1309.

Plaintiff relies on the deposition testimony of Dr. Barna, on the expectation of what Elenbogen's testimony will be at trial, and on the CDC report, to satisfy his burden of demonstrating positive evidence sufficient to raise a question of fact about the causation issue. None of this proffered evidence is adequate. Plaintiff fails to come forward with any admissible evidence that,

to a reasonable degree of medical certainty, his condition was more likely than not to have been caused by Philip Morris' cigarettes.

### 1. Dr. Barna's Testimony

Plaintiff points to deposition testimony in which Dr.Barna states that Abdishi's angioedema "could be categorized under allergic, localized reaction, like a burn," that "chemicals that are mucosal irritants can cause this type of allergic angioedema," and that MITC could cause an angioedema. (Pl.'s Resp. at 11, citing Barna Dep. at 64-68.)

As a preliminary matter, Philip Morris objects to any consideration of Dr. Barna's testimony regarding causation because Dr. Barna was not disclosed as an expert witness pursuant to Rule 26(a)(2)(A). Abdishi's Rule 26 disclosure listed only Elenbogen. [Dkt # 32]. Although Dr. Barna was Abdishi's treating physician, it is well-settled that:

> [i]n order to determine if an expert need be identified before trial, Rule 26 focuses not on the status of the witness, but rather on the substance of the testimony. . . . Under the Federal Rules, an expert must be identified if his testimony does not come from his personal knowledge of the case, or if his knowledge was acquired or developed in anticipation of litigation or for trial.

*Patel v. Gayes*, 984 F.2d 214, 218 (7th Cir.1993)(quotations and citations omitted).

Applying this standard, any opinion testimony by Dr. Barna about the cause of Abdishi's condition must be excluded. In his August 24, 1995 letter to Abdishi's counsel, Dr. Barna stated that he would not be able to give an opinion as to whether the possible contaminant was responsible for or contributed to Abdishi's condition without additional information about the possible contaminant. (Pl.'s Resp., Ex. A at 2-3). Dr. Barna testified that when he treated Abdishi he was unable to exclude bacterial infection as the cause of Abdishi's symptoms. (Barna Dep. at 72.) Where the treating physician's opinion as to causation is not based solely on his treatment and personal observations,

it must be disclosed pursuant to Rule 26(a)(2). *Zarecki v. Nat'l Railroad Passenger Corp.*, 914 F. Supp. 1566, 1573 (N.D. Ill.1996)(Zagel, J.).

However, even if Dr. Barna's testimony were considered on the issue of causation, he said nothing more than MITC could cause an angioedema. (Barna Dep. at 61-68.)[9] Significantly, he did not testify that MITC more likely than not was a substantial factor in causing Abdishi's condition.

In *Reaves*, the court held that the treating physician's testimony, that "it is conceivable" that exposure to asbestos caused the plaintiff's injury, was not enough to meet the standard of reasonable medical probability. 569 So.2d at 1309. In the present case, Dr. Barna's testimony does not go even that far. Thus, the testimony of Dr. Barna, even if it is considered on the issue of causation, is inadequate to raise a question of fact.

## 2. CDC Report

Plaintiff argues that the CDC's report, issued after its independent examination of Philip Morris' cigarettes, supports causation in this case because the report "seems to intimate that the inhalation of MITC that has been burned would/could cause additional health problems." (Pl.'s Resp. at 13-14.) In fact, the CDC report does not assist Plaintiff. Although noting limitations in its study, the CDC concluded that its investigation did not demonstrate that the cigarettes recalled by Philip Morris posed any additional health hazard beyond that normally associated with cigarette smoking. (CDC Report at 3.) Tests showed MITC to be present in cigarette filters from Philip

---

[9] It is questionable whether even this limited testimony by Dr. Barna would be admissible under the standards of *Daubert v.Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Dr. Barna acknowledged that he is not a toxicologist. (Barna Dep. at 67.) His deposition testimony that MITC could cause an angioedema was based on articles that were supplied to him, presumably by Plaintiff's counsel. (Barna Dep. at 68.) He did not testify to having conducted any independent studies or testing.

Morris brands of cigarettes manufactured up to a year prior to the recall, and also showed the presence of MITC in cigarette filters used by other manufacturers. (*Id.* at 2.) Based on reviews of the medical records of the individuals who called the CDC after the recall, most of their health complaints appeared to be caused by prolonged cigarette smoking. (*Id.* at 2.)

When asked at oral argument what portion of the CDC report Plaintiff relied upon, Plaintiff's counsel recited the following excerpt from pages 2-3 of the CDC report (Def.'s Mem, Ex. J):

> Although adverse health effects from MITC exposure (e.g., mucosal irritation of the respiratory and gastrointestinal tracts, conjunctival irritation, neurological symptoms) have been documented, there have been no assessments of the possible health effects of burned and inhaled tobacco that contains the level of MITC detected in this investigation or of inhaling heated MITC found in the filters.

(Tr. of Feb. 7, 2001 at 35-36.) Contrary to Plaintiff's argument, the fact that there have been "no assessments" of the risk does not support the conclusion that inhaling heated MITC found in filters caused Abdishi's condition. To conclude from the fact that there have been "no assessments" that, had assessments been done, they could or would support Plaintiff's claim is complete speculation.

Plaintiff had an opportunity to conduct testing on samples of recalled cigarettes. Defendant's counsel prepared a stipulated product testing protocol that was signed by Plaintiff's counsel in November 1999. (Def.'s Reply Supp. Mot. S. J., Ex. A.) It set out a procedure for testing samples of the recalled cigarettes that had been held by Philip Morris in cold storage. As Plaintiff's counsel acknowledged at oral argument, Plaintiff made a "legal or tactical decision" not to test the cigarettes. (Tr. of Feb. 7, 2001 at 29-30.) Thus, the absence of any proof of the results of testing is the direct result of Plaintiff's tactical decision.

Plaintiff also relies on the fact that the CDC fielded complaints from individuals who called in after the Philip Morris recall and reported physical complaints similar to those of which Abdishi

complained. Plaintiff argues, "There is no question that smokers across the nation experienced different types of physical sensations after smoking the contaminated cigarettes." (Pl.'s Resp. at 13.) Even putting aside the hearsay problems with Plaintiff's "evidence," the mere fact people reportedly telephoned complaints to the CDC does not prove that their symptoms were caused by contamination in Philip Morris cigarettes, especially when the CDC reported the opposite conclusion. Rather than raising a question of material fact as to causation, the CDC report instead adds further weight to Defendant's argument that there is no evidence in the record to support the necessary element of causation.

### 3. *Plaintiff's Anticipated Expert Testimony*

Plaintiff contends that testimony of his disclosed expert, Gilbert Elenbogen, coupled with all reasonable factual inferences that can be drawn from Elenbogen's testimony and from the testimony of Dr. Barna and the CDC report, is sufficient to allow the causation issue to go to the jury. (Pl.'s Resp. at 15.) Plaintiff cites Judge Guzman's ruling as qualifying Elenbogen "to render an opinion as to MITC and METAM." (Pl.'s Resp. at 17.) This characterization of Judge Guzman's ruling is correct as far as it goes. However, Plaintiff further contends:

> More importantly, however, Mr. Elenbogen opined as to causation in his deposition and clearly stated, "I gave him my opinion that at that time, I thought that the most likely cause of his, Mr. Abdishi's condition, was probably from MITC."

(*Id.*)[10]

---

[10] Plaintiff argues that all that is needed to show proximate cause is an inference of probability, which he argues, is created by Elenbogen's testimony, thus creating an issue of fact with respect to proximate cause. (Pl.'s Resp. at 16.) Rather than supporting Plaintiff's position, *Wintz v. Northrup Corp.*, No. 95 C 815, 1995 WL 758144, at * 3 (N.D. Ill. Dec. 22, 1995) (Kocoras, J.) supports Defendant's position that causation must be established by more than testimony that exposure to a contaminant can not be ruled out as the cause. Interestingly, one of the Plaintiff's experts in *Wintz* was Gilbert Elenbogen. The court in *Wintz* rejected Elenbogen's testimony as to

Plaintiff's contention fails to acknowledge the significance of Judge Guzman's prior ruling restricting the scope of Elenbogen's potential testimony. Judge Guzman rejected any proferred opinion testimony from Elenbogen relating to causation. Accordingly, the fact that Elenbogen offered an opinion on causation in his deposition is of no use to Plaintiff whatsoever, either to prove causation, or even to raise a question of fact about causation.

To raise a question of fact, Plaintiff must present evidence of the kind that would be admissible at trial. *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68, (7th Cir. 1994). It need not be in a *form* that would be admissible at trial (*e.g.,* evidence in affidavit form would be acceptable for purposes of summary judgment, although not necessarily admissible at trial.) However, the *content* must be admissible at trial. Here, Judge Guzman already has ruled that the content of Elenbogen's proposed testimony as to causation is not admissible at trial.

Also unavailing is Plaintiff's implied contention that, by proffering Elenbogen's causation opinion, Plaintiff has raised the prospect that expert testimony on causation somehow will materialize at trial, and thus has raised a question of material fact sufficient to avoid summary judgment. *See, e.g., Boruski v. U.S.,* 803 F.2d 1421, 1428 (7th Cir. 1986). In *Boruski,* the plaintiff argued on appeal that he raised a question of material fact in response to a summary judgment motion by indicating in his memorandum of law in the lower court proceeding that he expected to call three expert witnesses to counter evidence cited by the defendant. The Seventh Circuit held that unsworn statements in a legal brief about what evidence the plaintiff expected to present at trial were

---

whether a pregnant woman's exposure to bromide caused birth defects in her child. Elenbogen's proferred testimony was rejected for reasons essentially the same as those Judge Guzman articulated in rejecting Elenbogen's MITC testimony in the present case. The trial court's decision to grant summary judgment against the plaintiff was upheld on appeal. *Wintz v. Northrup Corp.,* 110 F.3d 508 (7th Cir. 1997).

inadequate to raise a question of fact in the summary judgment proceeding. Similarly in the present case, any suggestion that somehow at trial Elenbogen or some other witness will be able to testify to causation fails to raise a question of fact at this summary judgment stage.

When Judge Guzman ruled against Elenbogen's proferred causation testimony, he declined to grant Defendants' motion to dismiss, refusing to speculate on whether Plaintiff would be able to bring other evidence of causation at trial. *Abdishi*, 1999 WL 756054 at *9. At the present summary judgment stage, however, the Court no longer need speculate as to what trial evidence Plaintiff might offer. Plaintiff has the burden of bringing forth evidence in response to Defendant's motion for summary judgment and he has not done so.

### 4. *Circumstantial Evidence.*

Plaintiff finally argues that the facts that Philip Morris recalled cigarettes in May and June 1995, and that Abdishi smoked cigarettes for many years but never had the sensation in his throat that he experienced in June 1995 when he was hospitalized, when considered with Dr. Barna's testimony, the CDC report, and Elenborgen's testimony, create sufficient circumstantial evidence as to causation to create an issue of fact to go to the jury. (Pl.'s Resp. at 18-19.)[11]

---

[11] Abdishi cites the *Restatement (Third) of Torts* § 3 (1998), which states:

Circumstantial evidence supporting inference of product defect.
It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff: (a) was of a kind that ordinarily occurs as a result of product defect; and (b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

Abdishi does not discuss whether Florida courts have adopted Section 3, a revision of Section 328D of the *Restatement (Second) of Torts: Res Ipsa Loquitur*. Even more basically, Abdishi's case does not fit within §3. Abdishi's condition was not "of a kind that ordinarily occurs as a result of product defect." As the medical records show, Abdishi's throat condition could have been caused by an

Plaintiff's argument—essentially the classic *post hoc ergo propter hoc* reasoning—has been rejected by courts dealing with Florida product liability law. "Causation opinion based solely on a temporal relationship is . . . insufficient to satisfy the requirements of Federal Rule of Evidence 702." *Cartwright v. Home Depot U.S.A., Inc.*, 936 F. Supp. 900, 906 (M.D. Fla. 1996). *See also, Baker v. Danek Medical*, 35 F. Supp. 2d 875, 879 (N.D. Fla. 1998).

## CONCLUSION

Because Plaintiff has failed to present admissible evidence on the essential element of causation, the Court concludes as a matter of law that Plaintiff cannot establish liability under either the strict liability claim or the negligence claim. Defendant's motion for summary judgment is granted, and judgment is entered in favor of defendant Philip Morris, Inc. and against the plaintiff Kelson Abdishi on Counts I and IV, thereby terminating the last two remaining claims of Plaintiff's complaint.

**IT IS SO ORDERED.**

**GERALDINE SOAT BROWN**
**United States Magistrate Judge**

**DATED: September 25, 2001**

---

infection. The comments to *Restatement (Third)* § 3 state, "Section 3 claims are limited to situations in which a product fails to perform its manifestly intended function, thus supporting the conclusion that a defect of some kind is the most probable explanation." This is clearly not such a case.